**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| RAYMOND A. RICHARDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00954-NKL |
| | ) | |
| JOE PICCININI, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Pending before the Court are Defendant's motion for summary judgment, Doc. 40, and Plaintiff's motion to partially strike Defendant's statement of uncontroverted material facts, Doc. 44. For the following reasons, both motions are denied.

**I.     Statement of Uncontroverted Material Facts**[1]

Plaintiff Raymond A. Richards brought this suit against defendant Joseph Piccinini in his official capacity[2] as Director of Corrections for the Jackson County Department of Corrections.

---

[1] The Court has considered the parties' statements of material facts supported by evidence and drawn all inferences in favor of the non-movant. *Heacker v. Safeco Ins. Co. of Am.*, 676 F.3d 724, 726 (8th Cir. 2012). It has also fully considered Richards' motion to strike and relied only upon the facts the Court may properly consider on a motion for summary judgment. However, because the Court finds that "the appropriate means of opposing a movant's statement of uncontroverted facts is to include a statement of material facts as to which the party contends a genuine issue exists," the Court will not strike Defendant's statement of facts. *Brannon v. Luco Mop Co.*, No. 4:05CV01713 ERW, 2007 WL 172374, at *2 (E.D. Mo. Jan. 18, 2007), *aff'd*, 521 F.3d 843 (8th Cir. 2008) (internal quotations omitted); *see also Bauer v. Curators of the Univ. of Missouri*, No. 07-4044-CV-C-SOW, 2009 WL 10659036, at *2 (W.D. Mo. Dec. 18, 2009).

[2] Defendant devotes a substantial portion of its motion for summary judgment, Doc. 41, and reply suggestions in support, Doc. 45, to arguing that defendant Piccinini is entitled to summary judgment on the grounds of qualified immunity. However, because no claim has been raised

Richards alleges that Piccinini was deliberately indifferent to his serious medical needs by failing to provide necessary medical treatment during his incarceration at Jackson County Detention Center ("JCDC"), in violation of his constitutional rights and Section 1983.

Richards was incarcerated at JCDC during the relevant period, from March 10, 2015 until June 30, 2016. Doc. 41, pp. 2–3; Doc. 43, p. 2. At the time of his incarceration at JCDC, Joseph Piccinini was the Director of Corrections for the Jackson County Department of Corrections. Doc. 41, p. 2; Doc. 43, p. 2. The Jackson County Department of Corrections consists of: Jackson County Detention Center and Regional Correctional Center. Doc. 41, p. 2; Doc. 43, p. 2. The Director of Corrections' public employer is Jackson County, Missouri. Doc. 41, p. 7; Doc. 43, p. 7.

**A. Grievance Procedure**

Inmates are informed of the grievance procedure at JCDC by the Inmate Handbook, the Inmate Manual, and their case workers. Doc. 41, p. 4; Doc. 43, p. 4. Upon admission into JCDC, inmates are assigned a case worker and provided with an Inmate Handbook that provides a summary of the policies at the facility, including the five step grievance procedure. Doc. 41, p. 2–3; Doc. 43, p. 2. Each housing unit inside JCDC also contains an Inmate Manual. *Id.* When Richards first entered the facility, he was given an Inmate Handbook and assigned a case worker, Daniel Obiesie. *Id.* In May of 2015, Richards became an Inmate worker, causing his housing unit and case worker to change. *Id.* Richards was permitted to take his Inmate Handbook to his new housing unit. *Id.*

The Director of Corrections receives notice of a grievance upon receipt of a second-level appeal. Doc. 41, p. 4; Doc. 43, p. 3. Richards never completed the grievance process as it pertains

---

against Piccinini in his individual capacity, the Court need not address the issue of qualified immunity.

to a delay in treatment for a hernia or access to medical care. Doc. 41, pp. 4–5; Doc. 43, p. 4. However, Richards alleges that he submitted three (3) Requests for Administrative Remedy between October 2015 and January 2016 asserting that he was not being treated adequately by the medical unit. Richards also alleges that he spoke with Obiesie about those requests and does not recall receiving a response. Doc. 41, p. 5; Doc. 43, p. 4.

### B. Health Care Services

Jackson County is charged by law with the responsibility for administering, managing, and supervising the health care delivery system of JCDC. Doc. 43, p. 7; Doc. 45, p. 5. Effective February 1, 2013 until January 31, 2016, Jackson County and Correctional Healthcare Companies, Inc. ("CHC")[3] entered into a contractual agreement (the "Agreement"), wherein CHC would administer health care services and related administrative services at JCDC on behalf of Jackson County. Doc. 41, p. 5; Doc. 43, p. 4. On February 1, 2016, an addendum extended the Agreement between CHC and Jackson County. Doc. 41, p. 6; Doc. 43, p. 4. Jackson County expressly delegated to CHC all policy-making authority regarding policies and procedures for the delivery of health care services for inmates at JCDC. Doc. 43, p. 7; Doc. 45, p. 5. CHC established its own policies and procedures concerning the provision of health care for JCDC inmates, and the County agreed to modify or remove its own policies or procedures that conflicted with CHC policies. *Id.*

---

[3] The parties refer to Correct Care Solutions ("CCS") and its affiliated company, CHC, interchangeably as the entity Jackson County contracted with and delegated the task of administering, managing, and supervising the delivery of health care services to inmates, in the *Agreement for Inmate Health Care Services At Jackson County Missouri* effective February 1, 2013 through January 31, 2016 and extended February 1, 2016. *See* Docs. 41 and 43. For consistency, the Court will refer exclusively to contracting party, CHC, when referring to the entity responsible for administering, managing, and supervising the delivery of health care services to inmates at JCDC.

It was solely CHC's responsibility to make medical appointments for inmates with outside medical providers. Doc. 41, p. 5; Doc. 43, pp. 4, 7, 9; Doc. 45, pp. 5, 6. JCDC staff, including the Director, could not make an appointment for an inmate to have a surgical consultation with an outside health care provider. Doc. 43, p. 11; Doc. 45, p. 7. Furthermore, JCDC staff, including the Director, did not have the ability to tell CHC how to perform its responsibility concerning inmate medical care. *Id.* JCDC administration would not have, and in fact never, told CHC how to perform its responsibility of providing necessary medical care to inmates during the relevant time. *Id.*

Kay Elliott was the only CHC employee responsible for scheduling surgical consultations for inmates and the only employee at JCDC that would schedule a surgical consultation. Doc. 43, p. 9; Doc. 45, p. 6. Per CHC policy, CHC processes physician orders to schedule surgical consultations with off-site health care providers by opening a referral file in a system called ERMA. Doc. 43, p. 8; Doc. 45, p. 6. CHC policy then requires that an entry be made in ERMA advising the chief regional medical officer, Dr. Margot Geppert, of the recommendation of the physician that a surgical consultation be scheduled. Doc. 43, pp. 5, 8; Doc. 45, p. 6. The chief medical officer then reviews the file and can either approve the recommendation or require additional information. Doc. 43, pp. 5, 9; Doc. 45, p. 6. Once approved, Elliott was tasked with scheduling appointments on behalf of the medical unit. Doc. 41, p. 6; Doc. 43, pp. 5, 9; Doc. 45, p. 6. Any CHC employee that opened a referral file in ERMA could see all entries that had been made to the file up to the date such individual viewed the referral file. Doc.43, p. 9; Doc. 45, p. 6.

## C. Treatment of Richards

On October 13, 2015, Dr. Ross Sciara, CHC staff, diagnosed Richards with an inguinal hernia and recommended that the condition be treated with a hernia binder and over-the-counter

pain medication. Doc. 43, p. 7; Doc. 45, p. 5. On January 19, 2016, Richards again saw Dr. Sciara in the medical unit. Doc. 41, p. 6; Doc. 43, p. 5. Dr. Sciara diagnosed Richards' inguinal hernia as being "worse[]increasing [in] size [and] pain [and] non-reducing," advised that "it be repaired as soon as possible," and ordered a "consult [for] surgery at TMC for surgical correction of hernia as soon as possible." Doc. 41, p. 6; Doc. 43, pp. 5, 8; Doc. 45, p. 5. Elliott then made the following entry under the "History of Illness/Injury with Date of Onset" tab in Richards' file: "Rt inguinal hernia worse w/increasing size & pain & nonreduceable & is recommended to be repaired ASAP. Possible strangulation of hernia." Doc. 43, pp. 5, 8; Doc. 45, p. 6. Dr. Geppert approved the surgical consultation referral. Doc. 43, pp. 5, 9; Doc. 45, p. 6.

Following Dr. Sciara's recommendation that Richards attend a surgical consult, Elliott contacted Truman Medical Center to schedule an appointment. Doc. 41, p. 6; Doc. 43, p. 5. However, on January 20, 2016, Truman Medical Center declined the appointment requiring that Richards seek financial aid prior to the consultation. *Id.* As a result, Elliott did not schedule an appointment for surgical consultation. Doc. 41, p. 7; Doc. 43, pp. 5–6. Elliott made an entry in the referral file indicating that no surgical consultation was scheduled. Doc. 43, p. 9; Doc. 45, p. 6. Elliott's immediate supervisor, Teresa Mathis, reviewed Elliott's entry. Doc. 43, p. 10; Doc. 45, p. 6. Per CHC policy, and with the help of Dr. Geppert, Elliott then closed the referral file for Richards' surgical consultation without scheduling a consultation. Doc. 43, pp. 9–10; Doc. 45, p. 6. Each of Elliott's actions were made pursuant to CHC policy and procedures, which Defendant adopted as its own pursuant to the Agreement with CHC. Doc. 43, p. 10; Doc. 45, p. 6.

Richards' public defender, Jon Bailey, then filed a motion asking the Jackson County Court to intervene and order treatment for Richards' surgery. Doc. 43, p. 10; Doc. 45, p. 6. At the February 5, 2016 hearing on the motion, Judge Kevin D. Harrell of the Circuit Court of Jackson

County ordered JCDC to schedule an appointment with Truman Medical Center within 72 hours to receive, diagnose and/or secure medical intervention for Richards' hernia related condition. *Id.* Judge Harrell's administrative assistant sent a certified copy of the order to the population control clerk at JCDC on February 5, 2016. Doc. 43, p. 10; Doc. 45, p. 7. In accordance with standard procedure for JCDC to receive and process court orders, the population control clerk then forwarded the email with the order attached to multiple individuals working in the records department, and at least one individual working in the corrections department at JCDC. Doc. 43, p. 11; Doc. 45, p. 7. The February 5, 2016 order was not communicated to CHC until February 23, 2016. *Id.*

On February 22, 2016, Bailey, filed an emergency motion in Richards' criminal case. Doc. 41, p. 7; Doc. 43, p. 6. At the February 23, 2016 hearing, the court again ordered an appointment to be scheduled. *Id.* On February 26, 2016, Elliott scheduled Richards' surgical consultation appointment for March 2, 2016. *Id.*

Then Director of Corrections, Piccinini was not aware of Richards' allegations during the relevant time period, nor is he a medical professional. Doc. 41, p. 5–6; Doc. 43, p. 4. Neither he nor his staff became involved in any of the discussion about inmate care between the inmates and CHC (the medical unit) during the relevant period. Doc. 41, p. 6; Doc. 43, p. 4. JCDC staff's responsibility was to transport inmates to the medical unit or to off-site appointments previously scheduled by CHC. Doc. 41, p. 6; Doc. 43, p. 4. Richards admits that he was provided access to the medical unit at JCDC. Doc. 41, p. 7; Doc. 43, p. 7. However, he alleges that Jackson County's policies and customs have caused a constitutional deprivation. Doc. 41, p. 7; Doc. 43, p. 6.

## II. Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Durham D &M, LLC*, 606 F.3d 513, 518 (8th Cir. 2010) (citing *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005)); Fed. R. Civ. P. 56(a). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing there is a genuine issue of material fact for trial." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment.").

## III. Discussion

Defendant argues that it is entitled to summary judgment as a matter of law on Richards' § 1983 claim because, Richards failed to exhaust administrative remedies and failed to identify an unconstitutional policy or custom of Jackson County.[4]

---

[4] Richards' claim against Joseph Piccinini in his official capacity is a claim against Piccinini's employer, Jackson County. *See Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006). Thus to sustain the action against Piccinini in his official capacity, Richards must prove that the County "*itself* caused the constitutional violation at issue." *Id.* (quoting *Kuha v. City of Minnetonka*, 365 F.3d 590, 604 (8th Cir. 2003)). Defendant does not challenge that Jackson County is the appropriate government entity against which to bring § 1983 claims arising out of confinement at JCDC. Doc. 41, p. 16.

### A. Exhaustion of Administrative Remedies

Defendant asserts that, regardless of whether there are genuine issues of material fact, Richards' failure to exhaust administrative remedies entitles Defendant to judgment as a matter of law. Defendant relies for evidence on the admission of Richards in his deposition that he did not file a grievance complaining of the delay in scheduling an appointment or treatment for a hernia. Doc. 45, pp. 12–13.

The Prisoner Litigation Reform Act ("PLRA") states:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). This exhaustion requirement, however, "hinges on the 'availability' of administrative remedies"—that is, an inmate "must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 136 S.Ct. 1850, 1858 (2016). The availability of administrative remedies to a prisoner is a question of law. *Brown v. Croak*, 312, F.3d 109, 111 (3d Cir. 2002). To succeed on this basis, the County must prove that JCDC's administrative grievance process provided Richards an available remedy. *Jones v. Bock*, 549 U.S. 199, 216 (2007) (holding that exhaustion is an affirmative defense on which defendants bear the burden of proof); *Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005); *see also Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008) (finding summary judgment on basis of affirmative defense inappropriate where defendant failed to prove an element of its asserted affirmative defense).

A remedy is "available" if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S.Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). An administrative procedure is unavailable, however, "when (despite what regulations or guidance

materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* The Supreme Court in *Ross* explained:

> Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then "capable of use" for the pertinent purposed.

*Id.* Stated differently, "'where the relevant administrative procedure lacks authority to provide any relief,' the inmate has 'nothing to exhaust.'" *Id.* (quoting *Booth*, 532 U.S. at 736, n. 4). To provide an "available" remedy the administrative officers reviewing the grievance must have some "authority to act on the subject of the complaint," and take some responsive action "with respect to the type of allegations . . . raise[d]." *Booth*, 532 US at 736 n.4.

Richards asserts that JCDC's administrative grievance procedure did not provide an available administrative remedy capable of providing some relief for CHC's failure to schedule a surgical consultation, because the JCDC administrative body responsible for reviewing and responding to inmate grievances lacked authority to make such an appointment. Doc. 43, p. 11; Doc. 45, p. 7. It is uncontroverted that JCDC staff, including the Director, could not make an appointment for Richards to have a surgical consultation with an outside health care provider nor did they have the ability to tell CHC how to perform its responsibility concerning inmate medical care. Doc. 43, p. 11; Doc. 45, p. 7. The responsibility for scheduling surgical consultations with an outside health care provider rested solely with CHC. *Id.* JCDC in fact never told CHC how to perform its responsibility of providing necessary medical care to inmates during the relevant time period. Moreover, the Agreement between the County and CHC expressly states that the County did not have the authority to exercise control or direction over the manner or methods by which CHC performed its responsibilities under the Agreement. Doc. 42-2, p. 16 ("Nothing in this AGREEMENT shall be construed to create . . . any . . . relationship allowing the COUNTY or

9

DIRECTOR to exercise control or direction over the manner or methods by which CHC, its employees, agents or subcontractors perform hereunder").

Nevertheless, Defendant asserts that had the Director received any grievance regarding the delay in medical treatment from Richards, he "would've been on notice of the delay and been able to notify CCS of the grievance." Doc. 45, p. 12. However, the County has not provided any evidence to suggest that it was a policy or practice of JCDC for the Director to notify the medical unit of such grievances, let alone that notifying the medical unit of Richards' grievance would have resulted in some relief for the action complained of. To the contrary, both Piccinini and the CCS/CHC Health Services Administrator at JCDC, Mathis, have disavowed that JCDC staff and administrators had any authority to instruct CHC how to perform its responsibility of providing inmate medical care. Doc. 43-2 (Joseph Piccinini Deposition), pp. 22–27; 43-4 (Teresa Mathis Deposition), pp. 10–11.

Defendant also asserts that the fact that Richards' appointment was scheduled within six (6) days of receiving a second court order to schedule an appointment for Richards, "clearly indicates that Defendants Joseph Piccinini and Jackson County, Missouri were able to help remedy the delay once he had requisite knowledge that the delay existed." Doc. 45, p. 12. But the fact that JCDC and CHC took action following a court order to do so does not mean that filing an administrative grievance was an available remedy or would have led to the same result. This is particularly apparent, given the fact that JCDC took no action to comply with the February 5, 2016 order requiring it to schedule a surgical consult for Richards and scheduled a consultation only after receiving a second court order to do so.

The County cannot disclaim capacity to address Richards' grievance and then also assert that his suit must nevertheless be barred for failure to exhaust JCDC's grievance procedure. *See*

*Booth*, 532 US at 736 n.4. The County has failed to carry its burden of proving Richards' failure to exhaust an available administrative remedy. Thus, the County is denied summary judgment on this ground.

### B. Unconstitutional Policy or Custom

A claim brought against a public employer or municipality under § 1983 is sustainable only if a plaintiff's constitutional rights have been violated as a direct result of an "official custom, policy, or practice." *Granda v. City of St. Louis*, 472 F.3d 565, 568 (8th Cir. 2007); *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Thus, to survive summary judgment, Richards must allege facts which would support the existence of (1) a policy or custom of Jackson County (2) that caused a violation of plaintiff's constitutional rights. *See id.* "To prove the existence of a policy, a plaintiff must point to an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Schaffer v. Beringer*, 842 F.3d 585, 596 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 2299, 198 L. Ed. 2d 726 (2017) (internal quotations omitted).

Defendant asserts that it is entitled to summary judgment as a matter of law, because Richards failed to identify an unconstitutional policy or custom of Jackson County and Richards' real issue is with the treatment received by the medical unit (CHC). It asserts that JCDC did not have a policy regarding scheduling outside medical appointments; rather CHC had its own policy wherein it alone was responsible for scheduling outside medical appointments. Defendant further maintains that it is not liable for the actions alleged in Richards' Complaint, because JCDC "had the right to rely on medical professionals employed by C[HC]" to provide adequate medical care, including scheduling surgical consultations for inmates with outside doctors. Doc. 45, p. 8.

However, Jackson County's constitutional duty to provide medical care to inmates at JCDC

is not delegable. *West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the [county] of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the [county]'s prisoners of the means to vindicate their Eighth Amendment rights."); *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989) ("defendants have a nondelegable duty to provide medical care when needed"). Merely contracting for those services with an independent contractor "d[oes] not immunize [Jackson County] from liability for damages in failing to provide [Richards] with the opportunity for such treatment." *Crooks*, 872 F.2d at 804; *see also Ancata v. Prison Health Service, Inc.*, 769 F.2d 700, 706 (11th Cir. 1985) (finding "the county itself remain[ed] liable for any constitutional deprivations caused by the policies or customs of [its contractor]").

Richards asserts that because Jackson County delegated its policy-making authority concerning the provision of medical services for its inmates to CHC, the policies of CHC became the policies of the County. He argues that those official policies resulted in a deprivation of his right under the Fourteenth Amendment[5] to be free from cruel and unusual punishment, and therefore the County should be held liable. Specifically, Richards identifies CHC's "established policy of closing referrals for surgical consultations and not taking any further action to schedule the surgical consultation" when a consultation has not been scheduled as causing his constitutional deprivation. Doc. 42, pp. 9–10. In support of that policy, Richards points to the testimony of CHC employee Elliott that she closed the file opened for Richards' surgical consultation referral without scheduling an appointment and without further action being taken to ensure he received the

---

[5] Because Richards was a detainee while an inmate at JCDC, his claim is analyzed under the Fourteenth Amendment Due Process Clause and not the Eighth Amendment Due Process Clause. *See Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). However, pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts under the Eighth Amendment. *Id.*

necessary medical treatment to repair his hernia, pursuant to CHC policies. Doc. 43-3 (Kay Elliott Deposition), p. 41 ("Q. Is it accurate that the policies of CCS in place at the time that you closed this referral note required you to close the referral note after receiving the information from Tamara that a consult would not be scheduled until Mr. Richards saw financial aid? A. Yes. At that time, yes."). As further support that Elliott's actions were in accordance with CHC policy, Elliott's supervisor permitted closure of the file, despite being aware that a surgical consult had not been scheduled. Doc. 43, p. 10; Doc. 45, p. 6. CHC's regional chief medical officer, Dr. Geppert, also reviewed Richards' file and assisted Elliott in closing the referral even though it was clear from the file that no surgical consultation had been scheduled. Doc. 43, pp. 9–10; Doc. 45, p. 6.

Because JCDC delegated its responsibility to CHC and adopted CHC's policies regarding the provision of medical care to inmates at JCDC, the policies of CHC are for purposes of § 1983 liability the policies of JCDC and Defendant Jackson County. *See Crooks*, 872 F.2d at 804; *Cox v. Bentley*, No. 4:12-CV-02087-RDP, 2013 WL 6019530, at *4 (N.D. Ala. Nov. 13, 2013) ("If a policy or directive has resulted in deliberate indifference to the plaintiff's serious medical needs, it is immaterial whether the alleged directive in fact came from the defendants, or is the policy of the private medical provider."). To hold otherwise would be go against the purpose of § 1983 and permit Jackson County to insulate itself from liability for any constitutional deprivations regarding the provision of necessary medical care to inmates, by simply delegating that responsibility to an outside contractor. *See City of St. Louis v Praprotnik*, 485 U.S. 112, 126 (1988) ("If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose."). Thus, for purposes of surviving Defendant's motion for summary judgment, Richards has sufficiently

identified a policy attributable to Jackson County, which he alleges caused his constitutional rights to be violated.

In response to Defendant's motion for summary judgment, Richards also provides sufficient evidence to create a dispute of material fact as to whether, if true, the policy identified caused a constitutional violation. The County is liable for its policy if the policy itself violates federal law, or if, lawful on its face, it nevertheless "led an employee to violate a plaintiff's rights." *See Pietrafeso v. Lawrence Cty., S.D.*, 452 F.3d 978, 982 (8th Cir. 2006) (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407 (1997)). A policy is itself unconstitutional if it "affirmatively sanction[s]" unconstitutional actions or "a constitutional violation flows directly from" the policy. *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 389 (8th Cir. 2007). But where on its face lawful, a plaintiff must provide evidence "that the county's decision to maintain the policy was made with deliberate indifference to its known or obvious consequences." *Moyle v. Anderson*, 571 F.3d 814, 818 (8th Cir. 2009). Deliberate indifference is established where the policymaker "had notice of an alleged inadequacy in [its] policy" or "the policy's alleged inadequacy was so patently obvious that the [policymaker] should have known that a constitutional violation was inevitable." *Moyle*, 571 F.3d at 819. "[I]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out." *Ancata*, 769 F.2d at 704 (citing *Archer v. Dutcher*, 733 F.2d 14, 17 (2d Cir. 1984)); *Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995) ("Deliberate indifference may include intentionally denying or delaying access to medical care."); *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978).

Here, Richards points to specific evidence in the record to support his claim that the policy at issue affirmatively sanctioned or otherwise led to unconstitutional actions that caused the delay

14

in his receipt of necessary medical treatment. CHC was responsible for scheduling inmate appointments with outside health care providers. Doc. 43, p. 7; Doc. 45, p. 5. CHC's procedure for scheduling such appointments was to open a referral filed, which in Richards' case detailed the severity of Richards' hernia and Dr. Sciara's recommendation that the hernia be surgically repaired "as soon as possible." Doc. 43, p.8; Doc. 45, p 6. This information was reviewed by CHC's head employee at JCDC, Mathis, as well as regional chief medical officer, Dr. Geppert, making both officials aware of Richards' serious medical need.[6] Doc. 43, pp. 8–10; Doc. 45, p. 6. The County policy established by CHC, however, required closing Richards' referral file regardless of the fact that CHC failed to schedule Richards' appointment, for non-medical reasons. Doc. 43, p. 10; Doc. 45, p. 6. Pursuant to this policy, CHC employees, Elliott, Mathis, and Geppert, allowed the referral file to be closed without scheduling his surgical consultation. *Id.* As a result, no further action was taken to schedule Richards' consultation until February 26, 2018. Moreover, the County had notice that CHC's policy for scheduling an inmate's appointments with outside health care providers was inadequate, as evidence by the February 5, 2016 court order the County received requiring JCDC to obtain a surgical consult for Richards within 72 hours. Doc. 43, pp. 10–11; Doc. 45, pp. 6–7.

At this point, Jackson County has presented no direct evidence to rebut the allegation, supported by fact, that it implemented or allowed a policy that resulted in deliberate indifference to Richards' serious medical needs. It has instead only sought to disavow responsibility for CHC's policy, an argument unsupported by case law and contrary to the purpose of §1983. The burden was on Jackson County, as the moving party, to show either that there has been no deliberate

---

[6] Defendant does not challenge that Richards' inguinal hernia was a "serious medical need" in its motion for summary judgment.

indifference towards Richards' medical conditions, or that the deliberate indifference is not attributable to them. It failed to meet this burden. At the very least, there remains a genuine issue of fact as to whether or not Richards has been denied adequate medical care as a result of policies attributable to Jackson County. Therefore, summary judgment is improper at this time.

**IV.     Conclusion**

For the foregoing reasons, Plaintiff's motion to strike, Doc. 44, is DENIED. Defendant's motion for summary judgment, Doc. 40, is DENIED.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated:  September 18, 2018
Jefferson City, Missouri